IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GLENN T. TURNER,

                  Plaintiff,

  v.

LEBBEUS BROWN, MARK KARTMAN,
WILLIAM BROWN, GARY BOUGHTON,
LACEY DICKMAN, HEIDI BLOYER,
JULIE BULMANN, and ZACHARY BERGER,

                  Defendants.

OPINION and ORDER

17-cv-764-jdp

---

Pro se plaintiff Glenn T. Turner, a prisoner housed at Wisconsin Secure Program Facility, alleges that prison officials violated his constitutional rights in various ways when they refused to advance him through the prison's "High Risk Offender Program" and confiscated his inhaler even though they knew that he was at risk for an asthma attack. Before the court are the parties' cross-motions for summary judgment. Dkt. 16 and Dkt. 33. Because there are genuine disputes of material fact that preclude summary judgment for plaintiff, I will deny his motion in full. As for defendants' motion, I will grant it as to plaintiff's equal protection claim and all of his claims against defendants William Brown, Gary Boughton, Mark Kartman, and Lacey Dickman. I will deny the motion in all other respects. Also before the court is a motion to compel discovery filed by Turner. Dkt. 46. Because defendants have responded stating that they provided the sought information to Turner already, Dkt. 58, and Turner has not filed a reply, I will deny the motion to compel as moot.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

## A. The parties

Plaintiff Glenn Turner is an inmate at Wisconsin Secure Program Facility (WSPF) and he was housed at WSPF in the Foxtrot unit during the events of this lawsuit. Turner has filed numerous complaints with the inmate complaint review system at WSPF concerning prison conditions and alleged staff misconduct, has published articles about solitary confinement in Wisconsin prisons, and was interviewed by GQ Magazine about his experience in solitary confinement.

All defendants were employed at WSPF during the relevant time period: Gary Boughton was the warden, Mark Kartman was the security director, Heidi Bloyer was a sergeant in the Foxtrot unit, Lebbeus Brown was a captain and manager of the Foxtrot unit beginning in July 2016, Julie Bulmann was a correctional officer in the Foxtrot unit, Zachary Berger was a relief sergeant, Lacey Dickman was a social worker in the restrictive housing unit, and William Brown was an institution complaint examiner.

## B. High Risk Offender Program

The High Risk Offender Program (HROP) was a three-phase program at WSPF designed to facilitate the reintegration of inmates on administrative confinement status back to general population.[1] The program gave inmates with serious or chronic behavioral issues an opportunity to acquire the skills needed for successful transfer to a less controlled status or facility.

Inmates began HROP in the "red" phase and were required stay on the red phase for at least four months. The next phase was the "yellow" phase, which also had a four-month

---

[1] On May 7, 2018, HROP was replaced by a program called Progressing through Administrative Confinement Effectively (PACE).

minimum length of stay. The final phase was the "green" phase, which had a seven-month minimum length of stay. An inmate's movement within the program was determined by the inmate's compliance with the program, participation in programming, and the risk posed by the individual inmate. As an inmate progressed through each phase, he got more privileges and programming opportunities. If an inmate completed HROP successfully, he was recommended for placement in general population. At any time, inmates participating in HROP could be recommended by the unit team for demotion to a more restrictive phase based on behavior, the receipt of conduct reports, or failure to participate in or complete appropriate programming.

The HROP unit team was a multi-disciplinary team that met weekly to discuss the performance and progress of inmates participating in HROP. The team recorded each inmate's participation and progress through HROP and made recommendations about movement through the program on a DOC-30B form, which was signed by the social worker and unit manager. The recommendations were discretionary. The team forwarded the form to the security director for review, who then forwarded the team's recommendation to the warden for his final approval or denial.

In 2015 and 2016, all inmates participating in HROP were housed on the Foxtrot unit. Defendants Dickman and Lebbeus Brown led the HROP team beginning in July 2016. Defendants Bloyer and Bulmann were also on the team. Defendant Kartman reviewed the recommendations of the HROP team and defendant Boughton gave final approval or denial of recommendations. As a relief sergeant who worked in multiple units, defendant Berger was not a member of the HROP team and had little influence over whether an inmate would progress through HROP.

## C. Turner's participation in HROP

Turner was recommended and approved to participate in HROP in January 2015. At the time, Captain Primmer was the manager of the Foxtrot unit and Captain Gardner was the security director. (Neither Primmer nor Gardner are defendants in this lawsuit.) In January or February 2015, Turner began the red phase. At the February, March, and April 2015 reviews, the HROP unit team decided to keep Turner on the red phase because he had not yet completed the four-month minimum and because he had received multiple warnings for rule violations. (The rule violations did not lead to conduct reports and appear to have been relatively minor, including being loud during quiet hours, attempting to keep peanut butter from his meal tray, and refusing to show his hands during a cell interview with a psychologist. Dkt. 38-1 at 5, 6.) At his May 2015 review, the HROP team recommended that Turner be promoted to the yellow phase, despite Turner having received a rule violation warning in April for asking staff to get cookies from another inmate. Dkt. 38-1 at 8. Security Director Gardner agreed with the recommendation and Warden Boughton approved it.

Turner continued on the yellow phase in June, July, and August 2015. In September 2015, the HROP unit team recommended that Turner be promoted to the green phase, noting that he had completed programming and was demonstrating positive behavior in several areas. Dkt. 38-1 at 16–17. But Gardner recommended that Turner remain on the yellow phase because he had made an inappropriate sexual statement to a female staff member on September 6, 2015. *Id.* at 17. Warden Boughton denied the recommendation of promotion to the green phase based on Turner's sexual statement to the staff member.

In October 2015, the HROP unit team and Kartman recommended that Turner be promoted to the green phase, noting that he had received no rule violations in the last 30 days.

4

*Id.* at 18–19. But a few days after the team and Kartman made their recommendations, Turner received warnings for refusing to take off his "head gear" when directed, kicking his door, and screaming during meal handout. *Id.* at 20. The unit team and Kartman amended their recommendations, stating that Turner should be demoted to the red phase. *Id.* at 21. Warden Boughton agreed, and Turner was demoted to the red phase in November 2015.

In December 2015 and January 2016, the HROP team recommended that Turner remain on the red phase for monitoring. *Id.* at 22–23. In February 2016, the team recommended that Turner be promoted to the yellow phase, and both Kartman and Boughton agreed. *Id.* at 27. Despite some misbehavior on February 6 and 13, 2016, Turner remained on the yellow phase in March 2016.

In April 2016, the HROP unit team recommended that Turner be promoted to the green phase. Kartman and Boughton approved the recommendation, and Turner was promoted to the green phase on April 7, 2016. Turner remained on the green phase in May, June, and July 2016, even though there were some rule violations noted during this period, including: yelling at staff during phone calls and refusing to quiet down (May 5, 2016), telling staff to "fuck off" (May 6, 2016), and misusing the emergency intercom to ask for chips (June 9, 2016). *Id.* at 34, 36.

Captain Primmer put Turner on the enrollment list for "Thinking for Change," a green-phase program that was scheduled to begin in late June or July 2016. In July 2016, defendant Lebbeus Brown became manager of the Foxtrot unit and began leading the HROP unit team. Brown removed Turner from the "Thinking for Change" enrollment list. (Turner says that Brown told him that he was taken off the list because he "ma[kes] our job difficult by your constant complaining and court actions. And we can make your life difficult as well." Turner

5

says that Brown also stated, "You need your asthma inhalers so you can breathe and without them it'll be very difficult on you. You understand what I'm trying to say?" Brown denies saying this to Turner and denies threatening to take away Turner's inhaler.) Turner filed an inmate complaint about being removed from the program, but the inmate complaint examiner, Ellen Ray, recommended dismissal of the complaint on the ground that program assignments are not reviewable under the inmate complaint review system. Dkt. 39-1 at 2. Boughton accepted the recommendation and dismissed the inmate complaint.

Turner also alleges that throughout 2015 and early 2016, Captain Primmer and staff from the psychological services unit, including defendant Dickman, told him that the unit team had been instructed by defendant Lebbeus Brown to "not promote plaintiff to green phase HROP and to find any reason to prevent his progression." Turner also says that numerous times in July and August 2016, defendants Bloyer, Berger, Brown, and Dickman told him to stop "filing complaints about everything!" Defendants deny that Lebbeus Brown ever told the unit team to inhibit Turner's progression through HROP and deny telling Turner to stop filing complaints.

In August 2016, the HROP team identified several rule violations involving Turner that were listed in the unit's behavior log in July 2016: "fishing" (inmates passing property from one cell to another under the doors, using a string); having overdue library books; complaining that his water was off while he had clippers despite knowing that was standard procedure; having an inhaler belonging to another inmate; and having a book belonging to another inmate. *Id.* at 38. (Turner denies engaging in any of the behavior listed on the review. The accusation that Turner had another inmate's inhaler is discussed in detail in Section D below.) Based on the behavior log entries, the HROP unit team recommended that Turner be demoted to the

yellow phase. Kartman and Boughton concurred and Turner was demoted to the yellow phase. *Id.* at 39. (Turner says that he asked defendant Berger why he had been demoted to the yellow phase and that Berger responded by stating, "I don't know, but you file too many complaints." Berger denies saying this and states that he was not involved in the HROP team's decision to demote Turner.)

In September 2016, the HROP unit team recommended that Turner remain on the yellow phase because he had again engaged in "fishing" with another inmate (August 11), was disrespectful when staff members told him that they would no longer pass personal property items (August 25), and because he was objecting to requests that he retake programming that he had taken several years prior. *Id.* at 41.

On September 9, 2016, defendant Lebbeus Brown gave Turner a major conduct report for violating several Department of Corrections regulations that restrict group petitions and communications inside and outside of the prison system. Dkt. 38-2. Brown had conducted a year-long investigation into Turner's leadership role in the Gangster Disciplines and concluded that Turner had been manipulating a civilian to pass communications between Turner and others involved with the Gangster Disciples, in an attempt to restructure the Gangster Disciples in Wisconsin. *Id.* Because of the conduct report, Turner was removed from HROP.

**D. Confiscation of asthma inhaler from Turner's cell**

Turner has chronic asthma and, at times relevant to this case, was prescribed two types of asthma inhalers to treat his asthma: an albuterol "rescue" inhaler for use as needed during acute attacks, and an Alvesco "control" inhaler that he used once a day. Asthma inhalers prescribed in the prison are labeled with the patient's name and DOC number.

Turner says that on July 31, 2016, defendant Bloyer told Turner to stop complaining so much and threatened to "make his life miserable" by taking away his inhaler. Bloyer denies threatening Turner. It is undisputed that on the same day, while Turner was at recreation, defendant Bulmann confiscated an inhaler from Turner's cell during a cell search. (According to Bulmann, the name on the inhaler was similar to Turner's, but it was not Turner's name. Bulmann says that she gave the inhaler to defendant Bloyer, who put it in the health services bin located in the sergeant's station so that health services staff could retrieve the inhaler and ensure that it was routed to the correct inmate. Turner denies that he had another inmate's inhaler in his cell. He points to a note from health services staff stating that they had no record of an inhaler being returned on July 31 from Bulmann, Bloyer, or any Foxtrot unit staff. Dkt. 20-13.) Bulmann did not tell Turner that she had taken the inhaler and Turner did not notice that the inhaler was gone when he returned to his cell. (Defendants say that no one told Turner that an inhaler had been confiscated from his cell because, due to privacy concerns, they could not reveal of the name of the inmate on the inhaler. But defendants do not explain why they could not tell Turner that an inhaler had been taken without revealing the name on the inhaler.) Turner did not receive a conduct report for possessing the inhaler, but it was noted in the unit behavior log that he had another inmate's inhaler.

The parties dispute whether Turner suffered any harm as a result of the asthma inhaler being confiscated from his cell. According to Turner, he had an asthma attack beginning on August 1 and could not find his albuterol rescue inhaler. He pushed his emergency intercom button and told either defendant Bloyer or Sergeant Snodgrass that he was having difficulty breathing and needed medical assistance. Either Bloyer or Snodgrass turned off the intercom connection and did not contact health services. (Records show that Bloyer was not working

8

from 1:00 p.m. on August 1 until 6:00 a.m. on August 4.) Turner says that he then asked other inmates on his range whether they had taken his inhaler or found it while at recreation, but the other inmates denied having the inhaler. Turner asked neighboring inmates to push their intercom buttons and ask for medical attention for Turner. When they did so, the sergeant on duty, either Snodgrass or Berger, told Turner and the other inmates that Turner should submit a health service request. Turner says that his breathing became progressively worse between August 2 and 4, but that the sergeants on duty—Bloyer, Snodgrass, and Berger—refused to contact health services for him. Turner asked Bloyer and Berger whether anyone had found or reported an asthma inhaler or if staff had confiscated an asthma inhaler, but Bloyer responded that no one had.

Defendants dispute Turner's version of events, saying that there is no notation in the shift log book that Turner or any other inmate made any intercom calls or told any staff member during any rounds that Turner was having trouble breathing, needed an emergency inhaler, or had any medical concerns from August 1 to 4. According to defendants, any intercom calls or request for medical attention would have been recorded in the shift log book. Defendants also point out that Turner never submitted a health service request during this time period.

On August 4, 2016, Turner submitted a medication refill request, asking for an albuterol inhaler. He received a new inhaler on August 5. (Defendants state that the refill request was granted because Turner's prescription needed to be renewed every year, while Turner states that the refill was granted because his albuterol inhaler was missing. It is not clear from the medical records whether the refill request was processed as an annual renewal or because Turner reported that his inhaler was missing. Dkt. 37-1.)

9

### E. Turner's inmate complaint about the inhaler

On August 16, 2016, Turner submitted inmate complaint WSPF-2016-17570 about the inhaler that was confiscated during from his cell on July 31, 2016. Defendant William Brown, the institution complaint examiner, investigated the complaint by first speaking with Sergeant Bloyer. Bloyer told Brown that according to the unit log book, the inhaler was confiscated because it did not belong to inmate Turner. Bloyer reported to Brown that she gave the inhaler to health services. Brown then spoke with Nurse Edge in the health services unit. Edge reported that Turner had received a new inhaler on August 5, 2016. Brown recommended dismissing the complaint and Warden Boughton agreed and dismissed it.

## ANALYSIS

Turner is proceeding on the following claims: (1) First Amendment retaliation claims against Bloyer, Lebbeus Brown, Berger, Dickman, Kartman, and Boughton; (2) class-of-one equal protection claims against defendants Dickman, Lebbeus Brown, Kartman, and Boughton; and (3) Eighth Amendment medical care claims against defendants Bloyer, Lebbeus Brown, Bulmann, Berger, William Brown, and Boughton. Both sides have moved for summary judgment on all of the claims.

### A. Retaliation

I granted Turner leave to proceed on claims that defendants retaliated against him because of his numerous inmate complaints, lawsuits, and written articles challenging prison conditions and staff conduct when:

> (1) defendants Lebbeus Brown, Bloyer, and Bulmann confiscated his inhaler and Bloyer and Berger failed to get medical help for Turner's subsequent asthma attack;

> (2) defendant Lebbeus Brown impeded Turner's progress through HROP by removing Turner from the Thinking for Change program and demoting Turner to the yellow phase of HROP;
>
> (3) the remaining HROP team, consisting of defendants Dickman, Kartman, and Boughton, demoted Turner to the yellow phase of HROP; and
>
> (4) defendant Boughton dismissed Turner's grievance about being taken off the Thinking for Change enrollment list.[2]

To succeed on his retaliation claims, Turner must establish that: (1) he engaged in activity protected by the First Amendment; (2) defendants took actions that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) the First Amendment activity was at least a "motivating factor" in defendants' decisions to take those actions. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).

Turner has satisfied the first element of his retaliation claims by showing that he engaged in protected activity by filing inmate complaints and lawsuits and writing articles about prison conditions. *See Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012) ("A prisoner has a First Amendment right to make grievances about conditions of confinement.") (citation omitted). Defendants concede that Turner's activities were protected by the First Amendment.

Defendants do not address the second element of Turner's claim, and I can assume for purposes of summary judgment that confiscating an emergency inhaler, failing to provide medical care, impeding progress through HROP, and removing an inmate from programming

---

[2] In his summary judgment materials, Turner discusses several other allegedly retaliatory actions taken by defendants and other prison officials, including subjecting him to long-term solitary confinement, searching his cell and person excessively, monitoring his mail, and harassing his friends, but Turner was not granted leave to proceed on claims regarding these alleged incidents so I will not address them in this decision.

necessary to advance through HROP are actions that would deter an average inmate from participating in First Amendment activities in the future.

This leaves the third element of Turner's retaliation claims—whether Turner's complaints motivated defendants' decisions to take the adverse actions described above. Defendants contend that Turner has no evidence to suggest that they acted with a retaliatory motive. I disagree with defendants as to Turner's claims against Lebbeus Brown, Bloyer, Bulmann, and Berger, but I agree that Turner cannot show that Dickman, Kartman, or Boughton acted with a retaliatory motive.

As for Turner's claims that defendants Lebbeus Brown, Bloyer, and Bulmann retaliated against him by confiscating his inhaler and that Bloyer and Berger failed to get medical help for him after he suffered an asthma attack, Turner has submitted evidence sufficient to create a genuine factual dispute regarding these defendants' motives. It is undisputed that Turner was prescribed a rescue inhaler and that he was permitted to keep the inhaler in his cell. According to Turner, he did not have another inmate's inhaler in his cell. In addition, he states that, shortly before Bulmann removed the inhaler from his cell, Brown and Bloyer had threatened to confiscate his inhaler, and Brown, Bloyer, and Berger had told him to stop complaining so much. After Bulmann removed the inhaler, Turner could not find his rescue inhaler. And, Turner has submitted evidence that, despite defendants' assertion that the inhaler had another inmate's name on it and that Bloyer gave the confiscated inhaler to the health services unit, health services later notified Turner that it had no record of receiving any inhaler from the Foxtrot unit. A jury could conclude from these facts that Brown, Bloyer, and Bulmann took Turner's rescue inhaler and Bloyer and Berger ignored Turner's requests for medical care because these defendants were tired of Turner's numerous complaints about prison conditions.

There are also genuine disputes of material fact that preclude summary judgment as to Turner's claim that Lebbeus Brown acted with a retaliatory motive by removing Turner from the Thinking for Change program and demoting Turner to the yellow phase of HROP. Turner has submitted evidence that before Lebbeus Brown became manager of the Foxtrot unit, his progression through HROP was related directly to his participation in programming and his behavior. In addition, he has pointed to evidence suggesting that the HROP unit team did not consider minor rule violations to be sufficient reason to stop his progression through HROP. For example, the team did not recommend demotion when he engaged in minor misbehavior in May 2015 and February 2016, and the team recommended promotion to the green phase in April 2016 despite some rule violations. In June 2016, Captain Primmer registered Turner for the Thinking for Change program that Turner would need to progress further through the green phase of HROP.

But after Lebbeus Brown became manager of the Foxtrot unit, Brown removed Turner from the enrollment list for Thinking for Change. A short time later, Brown recommended that Turner be demoted to the yellow phase based on Turner's allegedly engaging in minor rule violations, including having another inmate's inhaler. Brown does not explain why he removed Turner from the enrollment list for the Thinking for Change, but he states that Turner's possession of another inmate's inhaler was a significant rule violation that justified demotion to the yellow phase. But there are genuine factual disputes about whether Turner had another inmate's inhaler and whether Brown directed Bloyer and Bulmann to confiscate the inhaler so that Brown could justify demoting Turner. If a jury believed Turner's version of events, it could conclude that Brown acted intentionally to prevent Turner from progressing through HROP in

retaliation for the numerous complaints and lawsuits Turner had filed regarding prison conditions.

Defendants argue that even if there are genuine factual disputes about their motivation, Lebbeus Brown, Bloyer, Bulmann, and Berger are entitled to qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). In other words, qualified immunity protects government actors who "'act in ways they reasonably believe to be lawful.'" *Jewett v. Anders*, 521 F.3d 818, 822 (7th Cir. 2008) (*quoting Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). But qualified immunity does not change the rule that facts must be construed in favor of the nonmoving party on a motion for summary judgment. *Board v. Farnham*, 394 F.3d 469, 476 (7th Cir. 2005). If I construe the facts in Turner's favor, then a reasonable jury could find that Brown, Bloyer, Bulmann, and Berger retaliated against Turner because he engaged in protected First Amendment activities. At the time, it was clearly established that retaliation for protected speech is unconstitutional. Therefore, these defendants are not entitled to qualified immunity.

As for Turner's retaliation claims against the remaining HROP team, defendants Dickman, Kartman, and Boughton, I agree with defendants that Turner has failed to present any evidence to suggest that these defendants demoted Turner to the yellow phase of HROP in August 2016 for retaliatory reasons. A review of the record shows that these defendants were involved in numerous decisions to both promote and demote Turner through HROP in 2015 and 2016, and that each of their decisions were logically related to Turner's behavior and progress through programming. Although Turner alleges that Dickman told him that Brown

14

directed the unit team to not promote Turner to the green phase in 2015 and early 2016, the record shows that Dickman, Kartman, and Boughton recommended and approved Turner's progression to the green phase in April 2016. And although these defendants recommended demotion to the yellow phase in August 2016 after Turner was accused of having another inmate's inhaler, Turner has submitted no evidence suggesting that Dickman, Kartman, or Boughton were involved in the confiscation of the inhaler or that these defendants would have any reason to think that the behavior log entries regarding the inhaler and Turner's other rule violations were false. The only reasonable conclusion from the evidence is that these defendants made a discretionary decision to demote Turner based on the information available to them and not for retaliatory reasons.

For similar reasons, Turner's claim that defendant Boughton acted with a retaliatory motive when he dismissed Turner's grievance about being taken off the Thinking for Change enrollment list fails. Turner has submitted no evidence that Boughton dismissed the grievance for any reason other than his agreement with the inmate complaint examiner that program assignments are not reviewable through the inmate complaint review system. Therefore, I will deny both sides' motions for summary judgment as to Turner's retaliation claims against defendants Lebbeus Brown, Bloyer, Bulmann, and Berger. But I will grant defendants' motion for summary judgment as to Turner's retaliation claims against defendants Dickman, Kartman, and Boughton.

**B. Equal protection "class of one"**

I granted Turner leave to proceed on equal protection claims against defendants Lebbeus Brown, Dickman, Kartman, and Boughton, based on his allegations that they blocked him from progressing through HROP and entering into general population without

15

justification. The Equal Protection Clause of the Fourteenth Amendment guards against government discrimination on the basis of race and other immutable characteristics, but it also protects people from discrimination by a government actor who arbitrarily and irrationally singles out one person for poor treatment for no rational reason. *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013). To succeed on a class-of-one claim, Turner would need to prove that defendants (1) intentionally discriminated against him, and (2) had no rational basis for singling him out for negative treatment. *See Brunson v. Murray*, 843 F.3d 698, 706 (7th Cir. 2016); *Del Marcelle v. Brown Cty. Corp.*, 680 F.3d 887, 914 (7th Cir. 2012).

Turner's equal protection claims appear to duplicate his retaliation claims. In any event, Turner does not have evidence to succeed on an equal protection claim. As discussed above, Turner does not raise a genuine issue of material fact about whether Dickman, Kartman, or Boughton unfairly singled him out for demotion in HROP, so he cannot succeed on his class-of-one claims against these defendants either. As for Lebbeus Brown, Turner argues that Brown harassed him and impeded his progress through HROP in retaliation for Turner's numerous complaints *and* because Brown was worried that if Turner was permitted into general population, he would attempt to organize inmates, take control of the prison, and engage in other behavior to further the agenda of the Gangster Disciples. Turner argues that he was singled out because of Brown's false belief that Turner is gang member. Turner's concession that Brown was motivated, at least in part, by security concerns dooms his equal protection claim.[3] Even if Turner thinks that the security concerns are invalid, the security concerns

---

[3] Turner's position that Lebbeus Brown was motivated by retaliatory reasons and security concerns does not doom his retaliation claim because Turner can succeed on his retaliation claim by showing that his protected activity was a "motivating factor" for his actions. *Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013).

provide Brown a rational basis for actions he took to keep Turner out of general population. In addition, Turner has not submitted any evidence suggesting that Lebbeus Brown, Dickman, Kartman, or Boughton permitted other prisoners suspected of having a leadership role in a gang and of attempting to organize prisoners to progress through HROP and move into general population. Although Turner argues that other prisoners progressed through HROP more quickly than he did, he has not shown that the other prisoners raised similar security concerns. *See Swanson*, 719 F.3d at 784 ("In most class-of-one cases, the comparison of similarly situated individuals will be used to show animus.").

Even if Turner had evidence suggesting that defendants harassed and singled him out for no rational reason, I also conclude that defendants are entitled to qualified immunity on Turner's class-of-one claim. Turner has identified no controlling legal authority stating that "class-of-one" equal protection claims can be raised in the prison context. Some courts have concluded that prisoners cannot bring class-of-one equal protection claims that challenge discretionary decisions by prison officials. *See Bub v. Swiekatowski*, No. 15-CV-195-JDP, 2019 WL 1434579, at *9 (W.D. Wis. Mar. 29, 2019) (holding that prison officials were entitled to qualified immunity on class-of-one claims brought by prisoner challenging discretionary decision). Because Turner has not identified any clearly established law stating that defendants' actions would have implicated Turner's right to equal protection, defendants are entitled to summary judgment on Turner's equal protection claims.

## C. Eighth Amendment medical care

I also granted Turner leave to proceed on Eighth Amendment claims that:

> (1) defendants Lebbeus Brown, Bloyer, and Bulmann violated his rights under the Eighth Amendment by confiscating his asthma inhaler despite knowing he had severe asthma;

17

> (2) defendants Bloyer and Berger refused to get medical treatment for him when he was having an asthma attack; and
>
> (3) defendants William Brown and Boughton failed intervene to obtain care for him.

To succeed on his Eighth Amendment claims, Turner must prove that defendants acted with "deliberate indifference" to a serious medical need. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Defendants do not deny that Turner's asthma is a serious medical condition or that, during the relevant time period, Turner was prescribed two inhalers to treat his condition. *See Lee v. Young*, 533 F.3d 505, 510 (7th Cir. 2008) ("As a general matter, asthma 'can be, and frequently is, a serious medical condition, depending on the severity of the attacks.'") (citation omitted). But defendants contend that Turner has submitted no evidence suggesting that they were deliberately indifferent to Turner's asthma or his need for an inhaler.

I agree with defendants that Turner has failed to show that William Brown or Warden Boughton were deliberately indifferent to his serious medical needs. William Brown's and Boughton's only involvement in the inhaler incident was their review and dismissal of Turner's inmate complaint in which he complained about his inhaler being confiscated. By the time Turner filed his complaint and these defendants reviewed it, the health services unit had provided Turner a new inhaler already. Therefore, their dismissal of his complaint did not constitute deliberate indifference to any serious medical need. I will grant summary judgment to William Brown and Boughton on Turner's Eighth Amendment claims.

But Turner has submitted evidence that creates a genuine dispute of material fact regarding the actions of Lebbeus Brown, Bloyer, Bulmann, and Berger. There are factual disputes about whether these defendants knew Turner had asthma and needed an inhaler, who directed Bulmann to confiscate the inhaler, whether the inhaler belonged to Turner or another

18

inmate, whether Turner suffered one or more asthma attacks between August 1 and August 4, and whether Bloyer and Berger ignored Turner's pleas for help. If a jury believed defendants' version of events, it could find that Bulmann conducted a random cell search of Turner's cell and confiscated an inhaler belonging to another inmate and that Turner never requested medical care from any of the defendants. But if a jury believed Turner's version of events, it could reasonably conclude that defendants Lebbeus Brown, Bloyer, Bulmann, and Berger acted with deliberate indifference to Turner's serious medical needs by intentionally confiscating his emergency inhaler and then ignoring his requests for medical assistance. Therefore, neither side is entitled to summary judgment on Turner's Eighth Amendment claims against Lebbeus Brown, Bloyer, Bulmann, and Berger.

**D. Claims remaining for trial**

I am denying Turner's motion for summary judgment in its entirety and am granting defendants' motion in part. The claims remaining for trial are Turner's (1) retaliation claims against defendants Lebbeus Brown, Bloyer, and Bulmann for confiscating his inhaler; (2) retaliation claims against Bloyer and Berger for failing to get medical help for Turner's asthma attack; (3) retaliation claim against Lebbeus Brown for removing Turner from the Thinking for Change program and demoting Turner to the yellow phase of HROP; and (4) Eighth Amendment claims against defendants Lebbeus Brown, Bloyer, Bulmann, and Berger for confiscating his inhaler and failing to get him medical help for his asthma attack.

ORDER

IT IS ORDERED that

1. Plaintiff Glenn T. Turner's motion for summary judgment, Dkt. 16, is DENIED.

2. The motion for summary judgment filed by defendants Berger, Bloyer, Gary Boughton, Lebbeus Brown, William Brown, Bulmann, Dickman, and Mark Kartman, Dkt. 33, is GRANTED IN PART and DENIED IN PART. The motion is GRANTED with respect to plaintiff's equal protection claim and all of his claims against defendants Boughton, William Brown, Dickman, and Mark Kartman. The motion is DENIED in all other respects.

3. Plaintiff's motion to compel, Dkt. 46, is DENIED.

Entered July 30, 2019.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge